**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ndeckant@bursor.com
        sbogdanovich@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ISAAC SHAPIRO, individually and on behalf of all others similarly situated,<br><br>                     Plaintiff,<br><br>       v.<br><br> SELLERS INTERNATIONAL LLC,<br><br>                     Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Isaac Shapiro ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Sellers International LLC ("Defendant").  Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     This is a class action suit brought against Defendant Sellers International LLC ("Defendant" or "Quimbee") for violating the Video Privacy Protection Act ("VPPA") and related California state privacy statutes by collecting and sharing highly-specific and sensitive information about consumers' video consumption habits without their consent to HubSpot, Inc.

2.     As Congress recognized in enacting the VPPA,"films are the intellectual vitamins that fuel the growth of individual thought."  S. Rep. No. 100-599, at 7 (Oct. 21, 1988) (citing Senate Judiciary Subcommittee on Technology and the Law, Hearing Tr. at 10 (Aug. 3, 1988)). Here, Defendant is a commercial provider of study materials for law students, similar to BarBri and Kaplan.  Specifically, Defendant owns and operates Quimbee.com, a website tailored to law students which provides them with "thousands of illustrated case brief videos intentionally designed to help [them] recall information."[1]  Accordingly, Quimbee delivers "purposefully design[ed] [] case brief videos … no longer than 6 minutes in length and pair[s] impactful visuals with key concepts."[2]  As Quimbee explains, "[t]he goal of our case brief videos is not to replace [your] readings but to provide enough visual and verbal context to set the scene, enabling you to easily recall every aspect of a case later on and survive a Socratic attack."[3]  Quimbee makes its videos available through a desktop browser and on iOS and Android Apps and is proudly "famous for creating legal-education videos that are fun to watch and easy to digest."[4]

---

[1] QUIMBEE, *Watch Cases Come Alive*, available at https://www.quimbee.com/study-aids/features/case-brief-videos (last accessed December 14, 2023).

[2] *Id.*

[3] *Id.*

[4] QUIMBEE, *Quimbee.com*, available at https://www.quimbee.com/ (last accessed Dec. 19, 2023).

3.      As the Committee on the Judiciary explained when considering the VPPA, "[Privacy] is an issue that goes to the deepest yearnings of all Americans that we are free and we cherish our freedom and we want our freedom.  We want to be left alone."  S. Rep. 100-599, at *6. The VPPA was meant to give consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers."  S. Rep. No. 100-599, at 8 (Oct. 5, 1988).  "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent."  *Id.*

4.      Quimbee violated the VPPA by knowingly disclosing personally identifiable information ("PII") of Plaintiff and class members, including a record of Case Brief videos they consumed, their names, and their emails to Hubspot, Inc. without their consent.  Specifically, Quimbee installed computer code on its website called the "HubSpot Tracking Code," which tracks and records Plaintiff's and the Class Members' private video consumption.  Behind the scenes of the webpages that display the case briefs—and unbeknownst to video viewers—this code collects Plaintiff and Class Members' video-watching history and discloses it to HubSpot, Inc.

## PARTIES

5.      Plaintiff Isaac Shapiro is presently a citizen of California, and has, at all relevant times, resided in Stanford or San Francisco.  Plaintiff is a law student who watches Quimbee case briefs as a study aid.

6.      Defendant Sellers International LLC is a limited liability company with its principal place of business at 9805 Statesville Road, Unit 4047, Charlotte, North Carolina 28269.  Defendant owns and operates Quimbee.com, which is used throughout California and the United States.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under a law of the United States (*i.e.,* the VPPA).  This Court also has supplemental jurisdiction over the California state law claims because they arise from the same transactions and occurrences which give rise to the action under federal law.  This Court also has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because the

amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, there are more than 100 members of the Class and California Subclasses, and there is minimal diversity.

8. This Court has personal jurisdiction over Defendant because it conducts substantial business and purposefully avails itself to the benefits of conducting business within California, including (1) selling, marketing, and advertising Quimbee.com to California consumers, and (2) collecting the private information from California Quimbee users. As such, a substantial portion of the events giving rise to Plaintiff's claims occurred in this state.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events or omissions giving rise to the claims occurred in this District. In particular, Plaintiff resides in this District and watched videos from Quimbee in this District.

**FACTUAL ALLEGATIONS**

**A.     The VPPA**

10. The origins of the VPPA begin with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper, which was then published. With an eye toward the digital future, Congress responded by passing the VPPA. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, or who some of the people they telephone. I think that is wrong. I think that really is Big Brother and I think it is something that we have to guard against.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

11. Accordingly, the VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or

1  services from a video service provider."  18 U.S.C. § 2710(a)(3).  A video tape service provider is

2  "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale,

3  or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. §

4  2710(a)(4).

5  **B.     Defendant Quimbee.com's Case Brief Videos**

6  12.     Quimbee.com is an online study aid service for law students which advertises to law

7  students as offering "the best study aids to take you to the top of the class."[5]

8  13.     Quimbee.com offers on-demand video lessons on particular legal topics to

9  individuals who create accounts and pay to sign up.

10  **Figure 1**



14  14.     Another prominent offering for paying account holders are Defendant's Case Brief

17  videos, which Quimbee routinely advertises as a significant component of its study aid services.

18  For example, on its front page, Quimbee highlights its Case Brief videos to potential consumers.

19  **Figure 2**



5 QUIMBEE, *Quimbee.com*, available at https://www.quimbee.com/ (last accessed Dec. 19, 2023).

15.     As Quimbee notes, "we're famous for creating legal-education videos that are fun to watch and easy to digest."[6]

16.     In fact, Quimbee makes no secret about how critical its Case Brief videos are to the service it offers its consumers.  To date, Quimbee offers its consumers more than 44,800 Quimbee-made Case Brief videos "keyed to the most popular law school casebooks."  In fact, as part of its service, and "[a]s with all Quimbee content, Quimbee case briefs are written by real attorneys.  Plus, Quimbee's editorial process ensures that each brief meets [Quimbee's] exacting standards."[7] As such, Quimbee encourages consumers to "[u]se [its] case briefs to comprehend your casebook readings faster, supplement your notes and outlines, and outshine your peers in class."[8]

17.     Accordingly, Quimbee "purposefully design[s] [its] case brief videos to be no longer than 6 minutes in length and pair impactful visuals with key concepts … [to] help reduce the amount of required memorization, allowing [the consumer] to help stay fully engaged, retain information more easily, and quickly recall essential facts in the classroom and on exam day."[9]

18.     Quimbee makes its Case Brief videos, which are only accessible to consumers, easily accessible by simply typing in the name of a case which produces an automatic drop-down menu for every case matching the keyword, with a link to that video page.  *See* Figure 3, next page.

---

[6] *Id.*

[7] QUIMBEE, *Understand Your Casebook Readings in Seconds*, available at https://www.quimbee.com/case-briefs-overview (last accessed Dec. 19, 2023).

[8] *Id.*

[9] QUIMBEE, *Wach Cases Come Alive*, available at https://www.quimbee.com/study-aids/features/case-brief-videos#:~:text=Become%20a%20member%20and%20get,to%20983%20law%20school%20casebooks (last accessed Dec. 19, 2023).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

**Figure 3**



17    19.    Once on the page, consumers are prompted to click the play button to view

18   Quimbee's animated Case Brief video and can read the corresponding notes underneath.  *See*

19   Figure 4, next page.

20
21
22
23
24
25
26
27
28

**Figure 4**



C.     **HubSpot Tracking Code and the Base64 Computer Language**

20.     HubSpot is a customer relations management platform which offers its users the power to automate marketing, lead generation, and sales engagement tools.[10]

21.     Specifically, when HubSpot tracking code is imbedded in a website's code, it tracks a user's interactions with the website to assist the website owner with compiling and managing website analytics for marketing, understanding website usage, automating chat bots familiar with routine customer inquiries, and a host of other marketing and customer management benefits derived from, and reliant on, collecting website visitor and user data.[11]

22.     HubSpot's tracking code is identified by its API signature.  An API is a "mechanism[] that enable[s] two software components to communicate with each other using a set

---

[10] HUBSPOT, *Get a Free Demo of HubSpot's CRM Platform*, available at https://shorturl.at/xzGTW (last accessed Dec. 19, 2023).

[11] Tyler Samani-Sprunk, *What is HubSpot and What Can I Do With It?* SIMPLE STRAT (Feb. 10, 2023), available at https://blog.simplestrat.com/what-is-hubspot (last accessed Dec. 19, 2023).

of definitions and protocols.  For example, the weather bureau's software system contains daily weather data.  The weather app on your phone 'talks' to this system via APIs and shows you daily weather updates on your phone."[12]  Put differently, an API "acts as an intermediary layer that processes data transfer between systems, letting companies open their application data and functionality to external third-party developers [and] business partners[.]"[13]

23.    On each page featuring its Case Brief video, Quimbee has installed a chatbox function with imbedded HubSpot code.  This code tracks a user's personally identifiable information and the name of the video, and makes it easily accessible to anyone by simply clicking "Inspect Element" on a web browser:

**Figure 5**



**Figure 6**



**Figure 7**



[12] AMAZON WEB SERVICE, *What is an API (Application Programming Interface)?*, available at https://aws.amazon.com/what-is/api/ (last accessed Dec. 19, 2023).

[13] IBM, *What is an API?*, available at https://www.ibm.com/topics/api (last accessed Dec. 19, 2023).

24.     Even simpler, the Payload data parses from the code string a consumer's email address and Identification Token.

**Figure 8**



**Figure 9**

identificationToken: eyJ0eXAiOiJKV1QiLCJhbGciOiJIUzI1NiJ9.eyJzdWIiOiJqb2hub1zbW10aGVtYWlsN08BnbWFpbC5jb20iLCJhdWQiOiIyMTMxNzEzOSIsImxhc3RfbmFtZSI6I1NtaXRoIiwiZXhwIjoxNzAzMTU5MjI1LCJpYXQiOjE3MDMxMTYwMjUsImZpcnN0X25hbWUiOiJKb2huIn0.uD92-71Pvh29xaamS6rNrDD3J-ADZieUWfS6KYVN3AA

email: johnnysmithemail7@gmail.com

25.     However, Quimbee does not just disclose the email address of the Quimbee consumer.  In fact, by disclosing a user's unique Identification Token, Defendant discloses the consumer's *actual name* to HubSpot.

26.     This is because HubSpot's Identification Tokens are not encrypted but are instead published in Base64.

27.     Base64 is a computer language known as "Hacker Pig Latin."[14]  This computer language is designed to carry and easily transfer data between sources by compressing the data into a simple, long string of plain text.  *See* Figure 10.

**Figure 10**

identificationToken: eyJ0eXAiOiJKV1QiLCJhbGciOiJIUzI1NiJ9.eyJzdWIiOiJqb2hub1zbW10aGVtYWlsN08BnbWFpbC5jb20iLCJhdWQiOiIyMTMxNzEzOSIsImxhc3RfbmFtZSI6I1NtaXRoIiwiZXhwIjoxNzAzMTU5MjI1LCJpYXQiOjE3MDMxMTYwMjUsImZpcnN0X25hbWUiOiJKb2huIn0.uD92-71Pvh29xaamS6rNrDD3J-ADZieUWfS6KYVN3AA

---

[14] Daniel Smallwood, *Hacker Pig Latin: A Base64 Primer for Security Analysts*, Dark Reading (Jan. 21, 2021), available at https://www.darkreading.com/cybersecurity-analytics/hacker-pig-latin-a-base64-primer-for-security-analysts (last accessed Dec. 19, 2023).

28.     Unfortunately for the privacy rights of Quimbee consumers, the Base64 language is as easily translatable as Serbian, Mongolian, or Swahili.  And just as any ordinary person can readily cut-and-paste Russian text into Google Translate to figure out what it means in English, any ordinary person can cut and paste Base64 text into any one of myriad Base64 decoding websites and figure out what the Base64 text means.

29.     If a user copies and pastes the Base64 text in the Identification Token depicted in Figures 7 through 10 to a Base64 text decoding website, it will reveal the Quimbee user's personally identifiable information.

**Figure 11**



30.     In seconds, any Base64 decoder can sift out the user's personally identifiable information, clearly indicating their name and email address.

**Figure 12**



31.     In fact, because Base64 encoding is limited to 64 available characters to use in its generated data strings,[15] "decoding it is trivial.  Simple, free Base64 encode/decode tools are easy to find online."[16]

**D.     The Base64 Computer Language Is Distinctive and Easily Recognizable**

32.     Like many other languages' distinctive sounds and symbols, Base64 has a distinctive alphabet and structure.  Whereas other computer languages frequently use special characters, the Base64 alphabet is limited from A-Z, a-z, 0-9, +, and /.[17]  This is a by-product of its alphabet being used to encode 6-bit strings of binary data (like "011011") into one letter in its 64-character alphabet.[18,19]  Moreover, any text in Base64 is always encoded in groups of four characters, and Base64 will use the "=" symbol for the first and only time at the very end of a string to ensure the string ends in a multiple of four.[20]

33.     Moreover, any ordinary person can input Base64 text into one of several generative AI chatbots like ChatGPT, and the AI will instantly recognize that the text is Base64 and translate it for the person.  *See* Figures 13 and 14, next page.

---

[15] Akshay Khot, *Base64 Encoding, Explained,* WRITE SOFTWARE, WELL (Oct. 23, 2023), available at https://www.writesoftwarewell.com/base64-encoding-explained/ (last accessed Dec. 19, 2023).

[16] Daniel Smallwood, *supra* note 14.

[17] B64ENCODE, *Base 64 Characters: A Comprehensive Guide with Tables, Regular Expressions, and More*, available at https://b64encode.com/blog/base64-characters/ (last accessed December 26, 2023).

[18] Chris Morrow, *An Introduction to Base64 Encoding*, MEDIUM (Aug. 8, 2021), available at https://levelup.gitconnected.com/an-introduction-to-base64-encoding-716cdccc58ce (last accessed Dec. 26, 2023).

[19] In other words, because 2 to the power of 6 is 64, a 64-character alphabet like Base64 can encode 6-bit binary data.

[20] B64ENCODE, *supra* note 17.

---

**Figure 13**

ChatGPT 3.5 ⌄

**You**
I'm about to send you a line of computer text. Can you tell me what the text means and which particular encoding scheme the content of the text uses?

**ChatGPT**
Absolutely, go ahead and share the text with me. I'll do my best to help you understand its meaning and encoding scheme.

**You**
eyJ0eXAiOiJKV1QiLCJhbGciOiJIUzI1NiJ9.eyJzdWIiOiJqb2hubn1zbW10aG
VTYW1sN0BnbWFpbC5jb20iLCJhdWQiOiIyMTMxNzEzOSIsImxhc3Rfbm
FtZSI6I1NtaXRoIiwiZXhwIjoxNzAzMTU5MjI1LCJpYXQiOjE3MDMxMTYw
MjUsImZpcnN0X25hbWUiOiJKb2huIn0.uD92-71Pvh29xaamS6rNrDD3J-
ADZieUWfS6KYVN3AA

**Figure 14**

**ChatGPT**
This looks like a JSON Web Token (JWT). It's a compact, URL-safe means of representing claims to be transferred between two parties. Let's break down the payload:

```json
{
  "sub": "john#smithSamuel7@gmail.com",
  "aud": "21317139",
  "last_name": "!Smith",
  "exp": 1703159225,
  "iat": 1703116025,
  "first_name": "John"
}
```

Here's a quick breakdown:

* `sub`: Subject, typically the user ID or some identifier.
* `aud`: Audience, the recipient for whom the token is intended.
* `last_name`: The user's last name.
* `exp`: Expiration time of the token in seconds since the epoch.
* `iat`: Issued at time in seconds since the epoch.
* `first_name`: The user's first name.

As for the encoding scheme, the text appears to be encoded in base64url.

1      34.    As applied here, the fact that Plaintiff's first and last name was disclosed in the

2  commonly used Base64 language as opposed to the English language is immaterial under the

3  VPPA.  Unlike many other countries, the United States is a melting pot with no official language.

4  So, it makes no difference whether personally identifiable information is disclosed in one language

5  as opposed to another.

6      **E.    Plaintiff and Class Members Do Not Manifest Assent to Quimbee's
         Inconspicuous Terms of Service or Privacy Policy**

7      35.    When signing up for an account on Quimbee.com, prospective consumers are

8  prompted to sign up for a free 7-day trial.  A pop-up emerges telling prospective consumers there

9  are: "No contracts or commitments.  When you click 'Start your free trial', you agree to our Terms

10  of Service and Privacy Policy."

**Figure 15**



36.    Yet a significant number of Quimbee's users never actually click on the "Start my

FREE trial" button depicted on Figure 15.  Instead, they click on the "Sign up with Google" or

"Sign up with Apple" button.  This will not create a contract.  "[M]erely clicking on a button on a

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED           13

webpage, viewed in the abstract, does not signify a user's agreement to anything.  A user's click of a button can be construed as an unambiguous manifestation of assent <u>only if</u> the user is <u>explicitly advised</u> that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022) (emphasis added) (citing *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29–30 (2d Cir. 2002)).[21]  And here, Quimbee consumers who click on the Sign up with Google or Apple buttons are never explicitly advised they are agreeing to anything by clicking those buttons.

37.     Worse yet, even prospective consumers do not have any reason to think their button click creates an agreement *to be bound* by the Terms of Service and Privacy Policy, because the textual notice right above the button tells them there are "<u>No contracts or commitments</u>."  Figure 16 (emphasis added).

38.     Prospective consumers who click the Google, Apple, or "Start my FREE trial" buttons see Quimbee's Terms of Service and Privacy Policy a second and final time at checkout.

**Figure 16**



39.     However, the checkout screen on Figure 16 again fails to explicitly advise prospective consumers <u>what action they would need to take to indicate their assent</u> to those Terms

[21] This is black letter law; indeed, Quimbee.com has a case brief video on it.  QUIMBEE, *Specht v. Netscape Commc'ns Corp.*, available at https://www.quimbee.com/cases/specht-v-netscape-communications-corp (last accessed January 2, 2024).

of Service or Privacy Policy.  Indeed, the textual notice on Figure 16 is substantially similar to the one found insufficient to form a contract in *Berman*.  A close-up, side-by-side comparison of the textual notice in Figure 16 and in *Berman* are reproduced below.

**Textual Notice in Figure 16**



**Textual Notice in *Berman*, 30 F.4th at 868, Appendix A**



40.     In *Berman*, even though the text directly above the Continue button advised users they were "agree[ing] to the <u>Terms & Conditions</u> which includes mandatory arbitration"—unlike the notice here—the court in *Berman* held the notice did not form a contract.  As Berman notes, "[t]he question before us is not whether [plaintiffs] may have been aware of the mandatory arbitration provision in particular, but rather whether they can be deemed to have manifested assent to any of the terms and conditions in the first place."  30 F. 4th at 858.  And that relevant question turns on the precise language of the notice.  The "notice must explicitly notify a user of the legal

significance of the action she must take to enter into a contractual agreement." *Id*. (emphasis added).  The notice here did not.

### F.     Plaintiff's Experience

41.     In or around December of 2022, Plaintiff Isaac Shapiro created a Quimbee account using a Gmail email account, bearing his real-life name, clicked the "Sign Up with Google" button, and began paying for a subscription.  He also gave Quimbee his real-life first and last name.

42.     Since creating the account, Plaintiff Isaac Shapiro frequently visited Quimbee to watch case brief videos for studying.

43.     When Plaintiff Isaac Shapiro watched Quimbee's case brief videos through his Quimbee account, Defendant disclosed his event data, which recorded and disclosed the video's URL and title as well as Plaintiff's name and email address to Hubspot in English and Base64.

44.     By disclosing his event data and identifiers, Defendant disclosed Plaintiff's personally identifiable information.

45.     Plaintiff discovered that Defendant surreptitiously collected and transmitted his personally identifiable information in December 2023.

## CLASS ALLEGATIONS

46.     **Class Definition:**  Plaintiff seeks to represent a nationwide class defined as (the "Class):

> All similarly situated individuals in the United States who have a Quimbee.com account, clicked the Sign Up with Google or Apple buttons, and viewed Quimbee case brief videos.

47.     **California Subclass:** Plaintiff also seeks to represent a California Subclass defined as (the "Subclass"):

> All similarly situated individuals in California who have a Quimbee.com account, clicked the Sign Up with Google or Apple buttons, and viewed Quimbee case brief videos.

48.     **Second California Subclass:** Plaintiff also seeks to represent a Second California Subclass defined as (the "Second California Subclass"):

> All similarly situated individuals in California who typed and searched any text content into the Quimbee search bar, and, if they signed up for a Quimbee.com account, clicked the Sign Up with Google or Apple buttons.

49.     Subject to additional information obtained through further investigation and discovery, the above-described Class and Subclasses may be modified or narrowed as appropriate.

50.     **Numerosity:**  Class Members are so numerous that joinder of all members is impracticable.  Plaintiff believes that there are thousands of Quimbee consumers who are members of the Class and subclasses and who have been damaged by Defendant's unlawful disclosures.

51.     **Commonality and Predominance:**  There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class and Subclasses that predominate over questions that may affect individual members of the Class and Subclasses include:

(a)     whether Defendant is a Video Tape Service Provider within the meaning of the VPPA;

(b)     whether Defendant collected Plaintiff's and the Class's PII;

(c)     whether Defendant unlawfully disclosed and continues to disclose its consumers' PII in violation of VPPA;

(d)     whether Defendant's disclosures were committed knowingly; and

(e)     whether Defendant's conduct violates California Civil Code § 1799.3;

(f)     whether Defendant's conduct under California Civil Code § 1799.3 was willful;

(g)     whether Defendant disclosed Plaintiff's, the Class's, and Subclass's PII without consent; and

(h)     whether Defendant intentionally recorded Plaintiff and the Second California Subclass Members' communications under the California Invasion of Privacy Act ("CIPA").

52.     **Typicality:**  Plaintiff's claims are typical of the claims of the Class and Subclasses because the name Plaintiff, like members of the Class and Subclasses, was a Quimbee consumer who consumed Quimbee case briefs.  Plaintiff was a consumer under the VPPA who, with Quimbee's knowledge, had his PII tracked and disclosed without his consent.

53.     **Adequacy:**  Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation.  Plaintiff and his

counsel are committed to vigorously prosecuting this class action.  Neither Plaintiff, nor his counsel, have any interest adverse to, or in conflict with, the interests of the absent members of the Class and Subclasses.  Plaintiff is able to fairly and adequately represent the interest of the Class and Subclasses.  Plaintiff has raised viable statutory claims of the type reasonably expected to be raised by members of the Class and Subclasses and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this complaint to include additional Class Representatives to represent the Class or Subclasses or additional claims as may be appropriate.

54. **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class and Subclasses is impracticable.  Even if every member of the classes could afford to pursue individual litigation, the Court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and the court system, resulting in multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents fewer management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each member of the classes.  Plaintiff anticipates no difficulty in the management of this action as a class action.  Class-wide relief is essential to compel compliance with the VPPA and California's related privacy statutes.

## CAUSES OF ACTION

### COUNT I
**Violation of the Video Privacy Protection Act**
**18 U.S.C. § 2710, *et seq.***
**(On Behalf of the Class)**

55. Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

56. Plaintiff brings this claim individually and on behalf of the members of the

proposed Class against Defendant.

57.     Defendant is a "video tape service provider" because it creates, hosts, and delivers thousands of videos on its website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).  In particular, Defendant provides a library of audio visual material to consumers for a monthly or annual fee, and inaccessible to users without Quimbee accounts.

58.     Plaintiff and members of the Class are "consumers" because they have accounts with Quimbee.com and pay a monthly or annual fee to watch videos.  18 U.S.C. § 2710(a)(1).

59.     Defendant disclosed to a third party, HubSpot, Inc., Plaintiff and the Class members' personally identifiable information.  Defendant installed the HubSpot tracking code to its website to compel Plaintiff's web browser to transfer Plaintiff's personally identifying information, like his name and email, along with Plaintiff's event data, like the title of the videos he watched to HubSpot, Inc.

60.     Plaintiff and the Class members viewed and accessed the case brief videos using Quimbee.com, through their Quimbee accounts.

61.     Defendant knowingly disclosed Plaintiff's PII because it used the data and installed HubSpot tracking code in the background of its webpages—which hosted the videos—for targeted advertising and remarketing.

62.     Plaintiff and the Class did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to HubSpot, Inc.

63.     Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA.  Specifically, Defendant's disclosures to HubSpot, Inc. were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

64.     On behalf of himself, and the Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of the Plaintiff and the Class by requiring Defendant comply with the VPPA's requirement for protecting a consumer's PII; (iii)

1    statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and

2    (iv) reasonable attorneys' fee and costs and other litigation expenses.

3                                    **COUNT II**
                          **Violation of California Civil Code § 1799.3**
4                              **(On Behalf of the Subclass)**

5    65.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set

6    forth herein.

7    66.     Plaintiff brings this claim individually and on behalf of the members of the

8    proposed Subclass against Defendant.

9    67.     Cal. Civ. Code § 1799.3(a) prohibits a "person providing video recording sales …

10   services" from disclosing "any personal information or the contents of any record, including sales

11   or rental information, which is prepared or maintained by that person, to any person, other than the

12   individual who is the subject of the record, without the written consent of that individual."

13   68.     Defendant is a "person providing video recording sales … services" because it sells

14   access to its online platform, Quimbee.com, which creates, hosts, and delivers thousands of videos

15   on its website.

16   69.     Defendant disclosed to HubSpot Plaintiff and the Proposed Subclass Members'

17   personal information.  Defendant utilized the HubSpot tracking code to compel Plaintiff's web

18   browser to transfer Plaintiff's identifying information, like their names, emails, as well as Plaintiff

19   and Subclass Members' event data, like the title of the videos they viewed.

20   70.     Plaintiff and the Subclass Members viewed the videos using Quimbee.com, through

21   their Quimbee accounts.

22   71.     Defendant knowingly disclosed Plaintiff's personal information because it installed

23   HubSpot tracking code in the background of its webpages—which hosted the videos— to send that

24   person information to HubSpot.

25   72.     Plaintiff and the Subclass Members did not provide Defendant with any form of

26   consent—either written or otherwise—to HubSpot.

27   73.     On behalf of himself and the Subclass, Plaintiff seeks: (i) declaratory relief; (ii)

28   injunctive and equitable relief as necessary to protect the interests of Plaintiff and the Subclass by

requiring Defendant comply with Cal. Civ. Code § 1799.3's prohibition against disclosing a

consumer's personal information; (iii) statutory damages of $500 for each violation of this law

pursuant to Cal. Civ. Code § 1799.3(c), and (iv) reasonable attorneys' fees and costs and other

litigation expenses.

## COUNT III
### Violation of California's Invasion of Privacy Act
### Cal. Pen. Code § 631
### (On behalf of the Second California Subclass)

74.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set

forth here.

75.     Plaintiff brings this claim individually and on behalf of the Second California

Subclass Members against Defendant.

76.     To establish liability under section 631(a), a plaintiff need only establish that the

defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any

of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electronically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

> *Or*

> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

> *Or*

> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

> *Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

77.     Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See In re Facebook, Inc. Internet Tracking Litig.,* 956 F. 3d 589 (9th Cir. 2020) (reversing dismissal of CIPA claim based on Meta's collection of consumers' Internet browsing history outside the https://facebook.com domain).

78.     Quimbee has installed the HubSpot tracking code into the code on webpages on Quimbee.com which have a search bar or a chat box allowing users to type in text or click on prerecorded messages. The HubSpot tracking code sent the text typed into the search bar or those prerecorded chat box messages to HubSpot, Inc.

79.     The HubSpot tracking code on these Quimbee webpages is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

80.     At all relevant times, by using the HubSpot tracking code, HubSpot, Inc. intentionally tapped, electronically or otherwise, the lines of internet communication between Plaintiff and Second California Subclass Members.

81.     In particular, the HubSpot tracking code recorded communications between Plaintiff and the Second California Subclass Members on the one hand and Quimbee on the other, by collecting the search terms for Case Brief videos entered by the consumer and storing that search in the form of a recorded URL which subsequently disclosed the video name and was accessible to HubSpot. *See* Figures 8-12. The Hubspot tracking code also collected the text of prerecorded messages Plaintiff and the Second California Subclass Members clicked on in the chat box features of the Quimbee website.

82.     At all relevant times, by using the HubSpot tracking code, HubSpot, Inc. willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempted to read or learn the contents or meaning of Plaintiff's and the Second California Subclass' electronic communications while the electronic communications were in transit or

passing over any wire, line, or cable, or were being sent from or received at any place within California.

83.     Defendant Quimbee aided HubSpot Inc., agreed with HubSpot, Inc., and conspired with HubSpot, Inc. to intercept Plaintiff and Second California Subclass members' communications by implementing the HubSpot tracking code to accomplish the wrongful conduct at issue here.

84.     Plaintiff and the Second California Subclass Members did not consent to any of Defendant and HubSpot Inc.'s actions in implementing the wiretaps of Plaintiff and the Second California Subclass Members. Nor have Plaintiff and the Second California Subclass Members ever consented to Defendant and HubSpot Inc.'s intentional access, interception, reading, learning, recording, and collecting of Plaintiff and the Second California Subclass Members' electronic communications between themselves and Quimbee.

85.     The violation of section 631(a) constitutes an invasion of privacy sufficient to confer Article III standing.

86.     Unless enjoined, Defendant and HubSpot Inc.'s will continue to commit the illegal acts alleged herein.  Plaintiff continues to be at risk because he frequently uses the search bar or chat box functions on Quimbee to find Case Briefs for studying.  Plaintiff continues to desire to use Quimbee for that purpose but cannot do so without being unwillingly monitored by Defendant via its embedded HubSpot tracking code.  Plaintiff is likely to use the search bar or chat box functions on Quimbee in the future.

87.     Plaintiff and the Second California Subclass Members seek all relief available under Cal. Pen. Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)     For an order certifying the Class, California Subclass, and Second California Subclass under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representatives of the Class and Subclasses, and naming Plaintiff's attorneys as Class Counsel to represent the Class and the Subclasses;

(b)   For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)   For an order finding in favor of Plaintiff, the Class, and Subclasses on all counts asserted herein;

(d)   An award of statutory damages to the extent available;

(e)   For punitive damages, as warranted, in an amount to be determined at trial;

(f)   For prejudgment interest on all amounts awarded;

(g)   For injunctive relief as pleaded or as the Court may deem proper; and

(h)   For an order awarding Plaintiff, the Class, and Subclasses their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.


Dated:  January 4, 2024                    **BURSOR & FISHER, P.A**.

                                           By:   */s/ Stefan Bogdanovich*
                                                    Stefan Bogdanovich

                                           Stefan Bogdanovich (State Bar No. 324525)
                                           Neal J. Deckant (State Bar No. 322946)
                                           1990 North California Blvd., Suite 940
                                           Walnut Creek, CA 94596
                                           Telephone: (925) 300-4455
                                           Facsimile: (925) 407-2700
                                           E-mail: ndeckant@bursor.com
                                                    sbogdanovich@bursor.com

                                           *Attorneys for Plaintiff*